IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JUDITH CAVALIERE             :          CIVIL ACTION
                             :
        v.                   :
                             :
ADVERTISING SPECIALTY        :
INSTITUTE INC.               :          NO. 11-1180

MEMORANDUM

Dalzell, J.                          February 16, 2012

        Plaintiff Judith Cavaliere ("Cavaliere") brings this

action against defendant Advertising Specialty Institute Inc.

("ASI") under the Family and Medical Leave Act ("FMLA" or the

"Act"), 29 U.S.C. §§ 2601, et seq., and the Americans with

Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq. Cavaliere

worked for ASI for nearly six years -- both as an associate

publisher and business development director -- before ASI

terminated her in 2010.  Cavaliere alleges that ASI retaliated

against her in violation of the FMLA,[1] and also discriminated

against her (based both on her actual disability and perceptions

of her disability) and retaliated against her in violation of the

ADA.

---

[1] Though Cavaliere's complaint also includes a claim
for interference with her rights under the FMLA, Pl.'s Compl. ¶¶
24-27, she has now withdrawn that claim.  Pl.'s Mem. of L. in
Opp'n to Def.'s Mot. Summ. J. ("Pl.'s Mem.") at 1 n.2.

ASI has filed a motion for partial summary judgment as to which Cavaliere has filed a response in opposition and ASI has filed a reply in support.  For the reasons that follow, we will grant ASI's motion in part and dismiss Cavaliere's claim for discrimination under the ADA on the grounds of estoppel as well as her damages claim for back pay and front pay.

## I.    Factual Background

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," where "[a] party asserting that there is a genuine dispute as to a material fact must support that assertion with specific citations to the record."  Bello v. Romeo, 424 Fed. Appx. 130, 133 (3d Cir. 2011).  We will thus recite the undisputed facts in this matter, pausing occasionally to supplement those facts with disputed factual assertions that the parties have supported with specific citations to the record.

### A.    Cavaliere's Career And Termination At ASI

Cavaliere began working for ASI in August of 2004 as an associate publisher, and became its business development director around January 1, 2007.  Her supervisor in the latter capacity

2

was Ed Koehler ("Koehler").  Def.'s Statement of Facts ("Def.'s Stmt.") ¶¶ 1-3; Pl.'s Resp. to Def.'s Stmt. ("Pl.'s Resp.") ¶¶ 1-3.  The position description for business development director stated that it required travel thirty percent of the time, Def.'s Stmt. ¶ 5 (citing Ex. 3 to Def.'s Stmt. ("Position Description")), and Cavaliere explained in her deposition that she believed her employment contract required travel between seventy-five and eighty percent of the time.  <u>Id.</u> (citing Ex. 12 to Def.'s Stmt. ("Cavaliere Dep.") at 74).  In any event, Cavaliere claims that "she could have performed her job without traveling," Pl.'s Resp. ¶ 5 (citing Cavaliere Dep. at 120 ("I could have done it from home.")), and that Koehler confirmed this fact.  <u>Id.</u> (citing Koehler Dep. at 54 ("As long as the rep makes the sales and the sales come in and they make their budget, whether they travel or not, it's up to them.")).

According to Koehler and ASI's publisher, Rich Fairfield ("Fairfield"), ASI had to deal with problems relating to Cavaliere's work that involved (1) pricing discrepancies in which Cavaliere's clients said they should have been billed at a lower amount than ASI billed them for particular advertisements, and (2) claims by those clients that they had not agreed to orders that Cavaliere had placed for them.  Def.'s Stmt. ¶¶ 6-7;

Pl.'s Resp. ¶¶ 6-7.  Some of these clients asked that a new ASI account representative replace Cavaliere.  Def.'s Stmt. ¶ 8; Pl.'s Resp. ¶ 8.  At a February 9, 2010 meeting with Koehler and Carol Albright ("Albright"), ASI's Senior Vice-President of Human Resources, Cavaliere received a Final Written Warning.  Def.'s Stmt. ¶ 12; Pl.'s Resp. ¶ 12.  At that meeting, ASI instructed Cavaliere to (1) stop submitting false orders, (2) make a list of existing orders with potential problems, and (3) submit that list to Koehler.  Def.'s Stmt. ¶ 20; Pl.'s Resp. ¶ 20.

Koehler and Albright ultimately decided to terminate Cavaliere's employment with ASI, and on March 8, 2010, Koehler and Albright informed her by phone that she had been fired. Def.'s Stmt. ¶¶ 26, 29; Pl.'s Resp. ¶¶ 26, 29.  Koehler testified that ASI terminated Cavaliere because (1) she was falsifying orders, (2) her inaccuracies regarding pricing had created problems with clients, and (3) she had failed to provide a complete list of problem accounts contrary to what she was told at the February 9, 2010 meeting.  Fairfield added that Cavaliere was terminated because she put in orders that were either not real or partially real, but at different prices than had been agreed upon.  Def.'s Stmt. ¶¶ 30-31; Pl.'s Resp. ¶¶ 30-31.  ASI

4

did not hire a new business development director following

Cavaliere's termination.  Def.'s Stmt. ¶ 32; Pl.'s Resp. ¶ 32.

### B.  Cavaliere's Health Problems

In October of 2009, Cavaliere was diagnosed with

spondylolisthesis.[2]  Def.'s Stmt. ¶ 34; Pl.'s Resp. ¶ 34.  She

also claims to suffer from osteoarthritis, fibromyalgia,[3]

degenerative disc disease, depression, obsessive-compulsive

disorder ("OCD"), and anxiety, and states that she has been

seeing an orthopedic surgeon, Dr. Jeffrey Miller ("Dr. Miller"),

for five or six years.[4]  Def.'s Stmt. ¶¶ 35-36; Pl.'s Resp. ¶¶

35-36.  According to Cavaliere, her condition flared up in

---

[2] Spondylolisthesis: "forward displacement of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, or of the fourth lumbar over the fifth, usually due to a developmental defect in the pars interarticularis." Richard Sloane, The Sloane-Dorland Annotated Medical-Legal Dictionary 483 (Supp. 1992).

[3] Fibromyalgia: "a chronic disorder characterized by widespread pain, tenderness, and stiffness of muscles and associated connective tissue structures that is typically accompanied by fatigue, headache, and sleep disturbances." Medline Plus Medical Dictionary, U.S. Dep't of Health & Human Servs., http://www.nlm.nih.gov/medlineplus/mplusdictionary.html.

[4] Though Cavaliere admits this statement, she also states that she "first treated with Dr. Jeffrey Miller on October 4, 2000." Pl.'s Statement of Facts ("Pl.'s Stmt.") ¶ 18 (citing Ex. F to Pl.'s Stmt. ("Miller Dep.") at 14).

September of 2009, causing pain in her hip that was treated with a steroid injection.  Def.'s Stmt. ¶ 37; Pl.'s Resp. ¶ 37. According to Dr. Miller, she told him on October 20, 2009 that she was experiencing pain in her right leg, and in December of that year stated that she was experiencing pain in her back, hip, and right leg.  Pl.'s Stmt. ¶¶ 23-24; Def.'s Resp. to Pl.'s Stmt. ("Def.'s Resp.") ¶¶ 23-24.  Dr. Miller further reported that Cavaliere told him on March 25, 2010 that she did not feel able to do her job due to its travel requirements.  Pl.'s Stmt. ¶ 25; Def.'s Resp. ¶ 25.  Cavaliere has seen a chiropractor, continues to treat with Dr. Miller, and began seeing a psychiatrist in 2011.  Def.'s Stmt. ¶¶ 38-40; Pl.'s Resp. ¶¶ 38-40.

### C.  __Cavaliere's Requests For Accommodations From ASI__

ASI claims that Cavaliere only made one request for accommodations from ASI on account of her health problems, asking for a chair and a lumbar support that ASI provided to her. Def.'s Stmt. ¶ 47 (citing Cavaliere Dep. at 137 (Counsel for ASI: "Did you ever request, other than asking Ms. Ambrose to rearrange your office -- and 'rearrange' is a loose term, but I think that's what you said -- did you request any other accommodation from ASI because of your back condition?"  Cavaliere: "Just the

6

chair.")).  Cavaliere responds that she "requested from Mr. Koehler that she be able to work from home after her back problems began to flare up in the fall and winter of 2009" and that he told her that she could not.  Pl.'s Resp. ¶¶ 40, 47 (citing Cavaliere Dep. at 120 ("I asked Ed if I could work from home when I started feeling ill and he said no.")).  While Cavaliere testified that she was not allowed to work from home while at ASI, she also testified that she "'could work at home for California calls, which I did late at night,'" Def.'s Stmt. ¶ 56 (quoting Cavaliere Dep. at 309); Pl.'s Resp. ¶ 56, and that she occasionally worked from home as part of her job at ASI. Def.'s Stmt. ¶ 56; Pl.'s Resp. ¶ 56.

Cavaliere also alleges in her complaint that ASI terminated her "in retaliation for seeking reasonable accommodations (periodic time off from work)."  Pl.'s Compl. ¶ 32.  ASI insists that Cavaliere never sought periodic time off from work, instead requesting only occasional days off "which ASI granted her without issue", Def.'s Stmt. ¶ 49 (citing Cavaliere Dep. at 261).  Cavaliere appears to agree with the first part of this statement, Pl.'s Resp. ¶ 49 (quoting Cavaliere Dep. at 261 (Counsel for ASI: "Was there a point where you sought periodic time off from work and were denied?"  Cavaliere: "No, just

days.")), but disagrees with the latter portion, Pl.'s Resp. ¶ 49 (citing Cavaliere Dep. at 260-62), apparently because Koehler "might have commented" on Cavaliere taking those days off. Cavaliere Dep. at 261.  The parties agree, in any case, that (1) Cavaliere never exhausted the number of days off that ASI allowed her, (2) all of the time off that she took was permitted by ASI, and (3) ASI never indicated to her that the time she took off from work played any role in her termination.  Def.'s Stmt. ¶¶ 52-53; Pl.'s Resp. ¶¶ 52-53.

ASI claims that Cavaliere never told anyone at ASI that she was unable to travel.  Def.'s Stmt. ¶ 57 (citing Cavaliere Dep. at 94 (Counsel for ASI: "Did you tell anyone at ASI while you still worked there that you could no longer travel at all?" Cavaliere: "No.")).  Cavaliere responds that she told Koehler about her inability to travel on specific trips, Pl.'s Resp. ¶ 57 (citing Cavaliere Dep. at 93-94), though she admitted that she never told him that she could not travel at all.  Cavaliere Dep. at 94.

### D.   Cavaliere's Requests For Leave From ASI

According to Cavaliere's testimony, while she never spoke with Koehler about taking leave under the FMLA, she did ask

8

Jeannette Killeri ("Killeri"), an employment specialist at ASI, about getting FMLA forms.  Cavaliere testified that Killeri told her she would get the forms for her, but never did.  Def.'s Stmt. ¶¶ 60-63; Pl.'s Resp. ¶¶ 60-63.  Cavaliere also testified that she spoke with Kathleen Piazza ("Piazza"), a disbursement accountant at ASI, about obtaining FMLA papers in late 2009, about two weeks after she spoke to Killeri.  Piazza printed out the FMLA forms from her computer and gave them to Cavaliere.  Def.'s Stmt. ¶¶ 65-67, 69-70; Pl.'s Resp. ¶¶ 65-67, 69-70.

Cavaliere did not fill out these forms, and never applied for FMLA leave from ASI.  Def.'s Stmt. ¶¶ 71-72; Pl.'s Resp. ¶¶ 71-72.[5]  ASI claims that Cavaliere testified that she did not fill out these forms because she didn't want FMLA leave, Def.'s Stmt. ¶ 73, but Cavaliere responds that her testimony "does not stand for the proposition that she did not want to invoke her rights under the FMLA."  Pl.'s Resp. ¶ 72.  The parties agree that neither Albright, nor Koehler, nor Ambrose was aware that Cavaliere had asked anyone at ASI about taking leave under the FMLA.  Def.'s Stmt. ¶¶ 74-76; Pl.'s Resp. ¶¶ 74-76.

---

[5] Though Cavaliere denies Paragraph 72 of ASI's Statement of Facts, it appears -- given her qualification of this denial -- that she meant to deny Paragraph 73.  Pl.'s Resp. ¶ 72.

9

The parties also agree that Cavaliere had to cancel two to three business trips in late 2009 due to her medical conditions. Pl.'s Stmt. ¶¶ 26-28; Def.'s Resp. ¶¶ 26-28. Cavaliere testified that during a business trip in September of 2009, she explained to Koehler that she could not attend certain (presumably trade) shows because of her back, and that traveling and driving were difficult for her. Pl.'s Stmt. ¶ 36 (citing Cavaliere Dep. at 275, 75 (Counsel for ASI: "Were you disciplined for not being able to attend the San Francisco show?" Cavaliere: "I told him that I had back problems.")). ASI denies that Cavaliere ever made any such statement to Koehler, Def.'s Resp. ¶ 36 (citing Koehler Dep. at 167 (Counsel for Cavaliere: "Did Ms. Cavaliere ever tell you that she was having difficulty traveling because of her back?" Koehler: "Not that I recall, no.")), and states that Koehler was only aware that Cavaliere had to cancel a single trip to Chicago. Def.'s Resp. ¶ 37 (citing Koehler Aff. at 163-65).

Cavaliere claims that after she informed Koehler of her medical conditions in September of 2009, Koehler made comments to her that she needed to care for her back on about ten occasions, Pl.'s Stmt. ¶ 38 (citing Cavaliere Dep. at 103-104, 106); ASI denies that Koehler ever made any such statements. Def.'s Resp.

10

¶ 38 (citing Ex. B to Def.'s Resp. ("Koehler Aff.") ¶¶ 4-6). Cavaliere testified that she wore a brace and shoulder device, including to work.  Pl.'s Stmt. ¶ 39; Def.'s Resp. ¶ 39.  Deb Mayfield, a sales representative at ASI, also testified that she overheard Koehler talking to an administrative assistant about Cavaliere being absent from work because of her back.  Pl.'s Stmt. ¶ 40; Def.'s Resp. ¶ 40.

### E.  Cavaliere's Capacity To Work At ASI

Cavaliere testified that she believed that she could have continued working even after her termination, and ASI admits that she was able to perform the essential functions of her job at the time of her termination.  Pl.'s Stmt. ¶¶ 42-43; Def.'s Resp. ¶¶ 42-43.  Cavaliere also testified that she looked for work after her termination from ASI but was unable to find work similar to what she had performed at ASI because each position she sought required travel, Pl.'s Stmt. ¶¶ 45, 47-50; Def.'s Resp. ¶¶ 45, 47-50, and that she waited until May 27, 2010 to apply for Social Security Disability Insurance ("SSDI") because she had hoped instead to find a job.  Pl.'s Stmt. ¶¶ 52-53; Def.'s Resp. ¶¶ 52-53.

**F.   <u>Cavaliere's Application For Social Security Benefits</u>**

Around May 27, 2010, Cavaliere applied for SSDI from the Social Security Administration ("SSA").  Def.'s Stmt. ¶ 77; Pl.'s Resp. ¶ 77.  ASI claims that Cavaliere "told the SSA that her disability began on March 8, 2010, which was the exact date on which ASI terminated her employment," Def.'s Stmt. ¶ 78, citing the SSA's April 19, 2011 decision in which it recorded that "[t]he claimant . . . is alleging disability since March 8, 2010."  Ex. 21 to Def.'s Stmt. ("SSA 2011 Decision") at P717.  Cavaliere denies this statement, Pl.'s Resp. ¶ 78, pointing to testimony in which she was asked, "So do you recall, at any time, you alleging that March 8th, 2010, was the date of onset of your disability?," and answered "I don't recall alleging that."  Cavaliere Dep. at 325.

In Cavaliere's submissions to the SSA, she answered the question, "'What were you able to do before your illnesses, injuries, or conditions that you can't do now?,'" by answering "'Walk long distances -- drive long distances -- fly on plane -- bend -- lift -- turning,'" and noting that her condition affected her ability to dress, bathe, and feed herself.  Def.'s Stmt. ¶¶ 81-82; Pl.'s Resp. ¶¶ 81-82.  Cavaliere explained that she does not do house or yard work because "'I'm in pain -- (chronic),'",

that her condition affected an array of daily activities,[6] and
that she could lift only five pounds and walk four blocks.
Def.'s Stmt. ¶¶ 84, 87; Pl.'s Resp. ¶¶ 84, 87.  When asked "[f]or
how long can you pay attention?," Cavaliere answered, "not long."
June 29 SSA Submission at P591.  Cavaliere submitted a report
from Dr. Miller in which he noted that Cavaliere reported on
March 25, 2010 "'that the pain has become incapacitating [and]
she is unable to continue working.'"  Def.'s Stmt. ¶ 89 (brackets
in Def.'s Stmt.); Pl.'s Resp. ¶ 89.  Dr. Miller also noted,
though, that Cavaliere "feels she is no longer able to do her job
because of the travel requirements."  Pl.'s Resp. ¶ 89 n.5
(quoting Ex. 25 to Def.'s Stmt. ("Miller Report") at P386), and
that she "has inability to travel including prolonged driving and
flying which is 50% of her job."  Miller Report at P386.

The SSA denied Cavaliere's SSDI application on November
23, 2010, and Cavaliere appealed this ruling the next month,
stating that "'I am disabled and unable to work.'"  Def.'s Stmt.
¶¶ 91-93; Pl.'s Resp. ¶¶ 91-93.  In her submissions, Cavaliere
stated that her condition had not changed since her last

---

[6] Including lifting, squatting, bending, standing,
reaching, walking, sitting, kneeling, stair climbing, completing
tasks, and concentration.  Ex. 23 to Def.'s Stmt. ("June 29 SSA
Submission") at P590.

disability report, explaining that she "'still can't sit, walk or drive,'" Def.'s Stmt. ¶ 94; Pl.'s Resp. ¶ 94, and that she could not fly on planes for her job.  Pl.'s Resp. ¶ 98 n.8 (citing Ex. C to Pl.'s Resp. ("SSA Application") at P583)).  In response to the question "'What changes have occurred in your daily activities since you last completed a disability report?,'" Cavaliere answered, "'All is basically the same -- with not working (after working a high level position for 25+ years) I'm very depressed.  I'm scheduled to see psychiatrist Jan. 4.  I loved my job -- never would have left.'"  Def.'s Stmt. ¶ 95; Pl.'s Resp. ¶ 95.  Cavaliere further stated that

> "I left my job in March 2010.  I had a 25-year career making [a] six figure income for many years.  I could not fly, drive or stand for long periods.  On my job I had to fly to trade show[s] and clients 60 percent of [the] time.  The denial letter from [Social Security] said I could do 'my job' -- I cannot.  I would not leave a [$]130,000 job if I could -- I paid all [Social Security] since I'm 17 -- now at 57, I need help and have no income.
>
> "I cannot do my job because of spondylosis [sic] -- degenerative disc disease -- arthritis[,] hip problems and now depression is getting worse because of this disability situation."

Def.'s Stmt. ¶ 98 (brackets in Def.'s Stmt.) (emphasis omitted from Def.'s Stmt.); Pl.'s Resp. ¶ 98.

The SSA denied Cavaliere's appeal on March 10, 2011, leading her to file a second appeal that month, Def.'s Stmt. ¶ 100; Pl.'s Resp. ¶ 100, in which she explained that "I had a high six-figure salary for many years -- a great job as a bus. dev. [business development] director.  I cannot work anymore due to spodolthesis [sic] -- degenerative arthritis -- fibromyalgia -- depression -- OCD -- anxiety."  Def.'s Stmt. ¶ 101 (brackets in Def.'s Stmt.); Pl.'s Resp. ¶ 101.  The SSA then issued a "Fully Favorable" decision on April 19, 2011, finding that (1) "'[t]he claimant has been under a disability as defined in the Social Security Act since March 8, 2010, the alleged onset date of disability,'" Def.'s Stmt. ¶ 102-03; Pl.'s Resp. ¶ 102-03; (2) Cavaliere's severe impairments included degenerative joint disease, lumbar disc herniation, spondylosis, and depression, Def.'s Stmt. ¶ 104; Pl.'s Resp. ¶ 104; (3) Cavaliere "'is unable to perform any past relevant work'" and "'there are no jobs that exist in significant numbers in the national economy that the claimant can perform,'" Def.'s Stmt. ¶ 105; Pl.'s Resp. ¶ 105; and (4) "'the requirement that the claimant alternate between sitting and standing every 15 minutes precludes her work as a publisher.'"  Def.'s Stmt. ¶ 105; Pl.'s Resp. ¶ 105.  Cavaliere

now collects $2,448 per month in disability benefits.[7]  Def.'s

Stmt. ¶¶ 106-07; Pl.'s Resp. ¶¶ 106-07.

Cavaliere concedes that she never told the SSA that her

departure from ASI was involuntary, Def.'s Stmt. ¶ 96; Pl.'s

Resp. ¶ 96, explaining this omission in a variety of ways that we

explore in Section II.A. below.

## II.  <u>Analysis</u>

On a motion for summary judgment, "[t]he moving party

first must show that no genuine issue of material fact exists,"

<u>Adderly v. Ferrier</u>, 419 Fed. Appx. 135, 136 (3d Cir. 2011)

(citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)),

whereupon "[t]he burden then shifts to the non-moving party to

set forth specific facts demonstrating a genuine issue for

trial."  <u>Id.</u>  "'A disputed fact is "material" if it would affect

the outcome of the suit as determined by the substantive law,'"

<u>J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.</u>, 650 F.3d 915,

925 (3d Cir. 2011) (quoting <u>Gray v. York Newspapers, Inc.</u>, 957

F.2d 1070, 1078 (3d Cir. 1992)), while a factual dispute is

genuine "'if the evidence is such that a reasonable jury could

---

[7] It bears noting that Cavaliere also receives about
$3,000 per month under a private disability policy Unum issued.
Def.'s Stmt.  ¶¶ 42-43; Pl.'s Resp.  ¶¶ 42-43.

return a verdict for the nonmoving party. . . . The mere
existence of a scintilla of evidence in support of the
plaintiff's position will be insufficient; there must be
[significantly probative] evidence on which the jury could
reasonably find for the plaintiff." Bialko v. Quaker Oats Co.,
434 Fed. Appx. 139, 141 n.4 (3d Cir. 2011) (quoting Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)) (bracketed
material in original).  We "draw all reasonable inferences in
favor of the nonmoving party, and [we] may not make credibility
determinations or weigh the evidence." Eisenberry v. Shaw Bros.,
421 Fed. Appx. 239, 241 (3d Cir. 2011) (quotation marks omitted).

### A.   Estoppel And Cavaliere's Disability Claim

ASI argues that "Cavaliere is estopped from claiming
that she could still perform the essential functions of her job
at ASI -- an essential element of a claim for disability
discrimination -- because she repeatedly took an irreconcilably
conflicting position with the Social Security Administration in
her successful quest for Social Security Disability Insurance
('SSDI') benefits."  Def.'s Mem. of L. in Supp. of Mot. Summ. J.

("Def.'s Mem.") at 1.  Cavaliere responds[8] that she "has asserted

throughout this matter that she was affected by her difficulties

with traveling," and that "[a] reasonable jury could find that

Ms. Cavaliere could have performed her job for Defendant without

having to perform the high level of travel that she has [sic]

been previously doing, but that she was unable to find a new

---

[8] Cavaliere also suggests that ASI "has already
admitted in this litigation that Ms. Cavaliere was able to
perform the essential functions of her position at the time of
her termination" in response to Cavaliere's requests for
admissions, Pl.'s Mem. at 10 (emphasis omitted), and that
"'[b]ecause admissions are conclusive, they are not weighed
against competing evidence on a summary judgment motion.'" Id.
(quoting Kida v. EcoWater Sys. LLC, 2011 WL 4547006, at *4 (E.D.
Pa. 2011).  It is true that Rule 36 admissions are ordinarily
conclusive, and that this practice serves to preserve the
efficacy of the discovery process.  As our Court of Appeals
observed nearly sixty years ago, however, the doctrine of
judicial estoppel aims to prevent "playing 'fast and loose with
the courts' which has been emphasized as an evil the courts
should not tolerate." Scarano v. Cent. R.R. Co. of N.J., 203
F.2d 510, 513 (3d Cir. 1953).  Though giving conclusive effect to
Rule 36 admissions undoubtedly serves an important interest, the
doctrine of judicial estoppel advances a higher purpose:
protecting the integrity of the courts.  We will not permit a
party to play "fast and loose with the courts" just because the
opposing party made an admission that would appear to permit such
sharp practice.  Under the circumstances, we will construe ASI's
presentation of its judicial estoppel argument as a request to
withdraw its admission that Cavaliere was able to perform the
essential functions of her position at the time of her
termination, and will grant this request pursuant to Fed. R. Civ.
P. 36(b).

position where she would not be required to travel."  Pl.'s Mem. of L. in Opp'n to Def.'s Mot. Summ. J. ("Pl.'s Mem.") at 6.

As our Court of Appeals has explained, "[t]o establish a prima facie case of discrimination under the ADA, a plaintiff must show that he (1) is disabled, (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer, and (3) has suffered an adverse employment action as a result of discrimination." Irving v. Chester Water Auth., 439 Fed. Appx. 125, 126 (3d Cir. 2011).  As the Supreme Court observed in Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 797 (1999) (quoting 42 U.S.C. § 423(d)(2)(A)) (brackets and ellipsis in original), "[t]he Social Security Disability Insurance (SSDI) program provides benefits to a person with a disability so severe that she is 'unable to do [her] previous work' and 'cannot . . . engage in any other kind of substantial gainful work which exists in the national economy.'"

While it might appear, at first glance, that a plaintiff's pursuit of SSDI must logically estop her from asserting the second element of a prima facie case under the ADA, the statutes differ in one crucial respect: while the ADA considers whether a plaintiff can perform her job with reasonable

19

accommodations, the SSA does not take such accommodations into account in determining eligibility for SSDI.  Id. at 803.  As a result, the Supreme Court has concluded that "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim."  Id. at 797. But "an ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work.  To survive a defendant's motion for summary judgment, she must explain why that SSDI contention is consistent with her ADA claim," id. at 798 -- that is, her "explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'"  Id. at 807.

### 1.   Cavaliere's Representations To The SSA

ASI argues that Cavaliere's representations to the SSA cannot be reconciled with the claim that she can perform the essential functions of her job at ASI, since Cavaliere made "many definite and unambiguous claims that she was not capable of working at ASI."  Def.'s Mem. at 15.  Though Cavaliere did make categorical and unqualified statements to the SSA such as "I am

20

disabled and unable to work," Def.'s Stmt. ¶ 93; Pl.'s Resp. ¶

93, our Court of Appeals has cautioned that such statements to

the SSA should be read with the implied qualification "without

reasonable accommodation," Turner v. Hershey Chocolate USA, 440

F.3d 604, 609 (3d Cir. 2006) -- so that Cavaliere's statement

above becomes "I am disabled and unable to work without

reasonable accommodation," which is certainly reconcilable with

the prima facie elements a plaintiff must prove under the ADA.

Rather than focus on Cavaliere's general descriptions of her

capacity to work, we will instead examine two other types of

statements she made to the SSA regarding (1) the reason she

stopped working at ASI, and (2) particular limitations on her

capacities.[9]

---

[9] We note that Judge Stengel has synthesized Cleveland and the jurisprudence of our Court of Appeals on this subject as requiring "a two-part analysis when an employment discrimination plaintiff has applied for and received SSDI benefits.  First, the court must determine whether the positions taken by the plaintiff in his SSDI application and his [discrimination] claim genuinely conflict.  Then, it must evaluate whether the plaintiff's explanation for that inconsistency meets the standard set forth in Cleveland." Ruhl v. Cty. of Lancaster, 2011 WL 3862257, at *4 (E.D. Pa. 2011).  In the context of this framework, Cavaliere's statement that she was "unable to work" satisfies the first step of the analysis, leading us to consider her explanations thereof and particular representations to SSA in the second.

21

As we have noted, Cavaliere admits that she did not inform the SSA that she left ASI involuntarily.  Cavaliere explains this lacuna and her statements to SSA in three ways: (1) "she filled out what was asked on the forms and . . . the forms did not inquire [about] the reasons for her separation," Pl.'s Resp. ¶ 96 n.6 (citing Cavaliere Dep. at 337); (2) "her statement was accurate because she 'never would have left' had circumstances not forced me to leave my job, meaning Ed Koehler not relaying to management that I had a back problem," id. ¶ 97 n.7 (quoting Cavaliere Dep. at 336-37); and (3) "by left, she mean[t] gone and that it was not her decision to leave the company."  Id. (citing Cavaliere Dep. at 335-36).

Even if we draw all reasonable inferences from the record in Cavaliere's favor, her explanations are fanciful. Cavaliere asserted to the SSA that "'I left my job in March 2010. . . .  The denial letter from [Social Security] said I could do "my job" -- I cannot.  I would not leave a [$]130,000 job if I could.'"  Def.'s Stmt. ¶ 98 (emphasis omitted); Pl.'s Resp. ¶ 98. Thus, whether or not the forms inquired about the reasons for Cavaliere's separation, she volunteered such reasons to the SSA. And despite Cavaliere's theories about the equivalence between

the words "left" and "gone," her use of the verb "leave"[10] to the SSA suggests that her departure was voluntary.[11]   The unavoidable implication of Cavaliere's statements is that she could not do her job (without reasonable accommodations) and therefore left voluntarily, and that she would not have left but for her inability to do her job -- not that ASI terminated her involuntarily.   There can be little doubt that presenting the former account to the SSA -- rather than the latter -- helped Cavaliere's SSDI application, since a version of the events in which she voluntarily left a high-paying job due to an inability to work would bolster the heft of her claims to the SSA that she was seriously disabled.   Though the parties agree that the latter

---

[10] As defined by the Oxford English Dictionary, leave means "[t]o depart from, quit, relinquish" -- a definition that underscores its connotations of voluntariness, as the OED's usage examples confirm, e.g., "1837 DICKENS Pickw. ii, I think we shall leave here the day after to-morrow"; "1866 THIRLWALL Lett. II 70, I do not leave for town until tomorrow."; "1791 BENTHAM Let. 12 May, Wks. 1843 x. 254 So says Lord L. who himself leaves on the 1st." VIII Oxford English Dictionary 777-78, def. II (2d ed. 1989).

[11] We use voluntary here to mean that Cavaliere, and not her employer, made the ultimate choice as to whether she would continue working.   We do not mean that this choice was freely made in the sense that it was not compelled by circumstances.

account is more accurate, we will hold Cavaliere to the former account in determining how estoppel applies to her ADA claims.

As for Cavaliere's specific limitations and symptoms, she informed the SSA on June 29, 2010 that as a result of her disability, she could no longer "'[w]alk long distances -- drive long distances -- fly on plane -- bend -- lift -- turn[ing],'" and that her disability affected her ability to dress, bathe, and feed herself. Def.'s Stmt. ¶¶ 81-82; Pl.'s Resp. ¶¶ 81-82. She also suggested that her disability limited her ability to engage in an array of activities: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, and concentration. June 29 SSA Submission at P590. Importantly, when asked "[f]or how long can you pay attention?," Cavaliere answered, "not long." Id. at P591. Cavaliere explained in the same submission that "'I'm in pain -- (chronic),'" Def.'s Stmt. ¶ 84; Pl.'s Resp. ¶ 84, and submitted a report from Dr. Miller in which he noted her self-report on March 25, 2010 "'that the pain has become incapacitating [and] she is unable to continue working.'" Def.'s Stmt. ¶ 89 (bracketed material in Def.'s Stmt.); Pl.'s Resp. ¶ 89. Finally, Cavaliere suggested in December of 2010 that she "cannot work anymore due to spodolthesis [sic] -- degenerative arthritis -- fibromyalgia -

- depression -- OCD -- anxiety.'"  Def.'s Stmt. ¶ 101 (brackets in Def.'s Stmt.); Pl.'s Resp. ¶ 101.

### 2.   Reconciling Cavaliere's Representations

Cavaliere attempts to reconcile these representations to the SSA.  She contends that she "could have done her job from home or with less travel," Pl.'s Mem. at 6, and that (1) "Defendant did not work with her to have decreased travel instead of just letting her go," Pl.'s Stmt. ¶ 58; and (2) "Ms. Cavaliere requested that she be able to work from home form [sic] Mr. Koehler, but was told that she would not be allowed to do so." Pl.'s Mem. at 6.  Thus, the two "reasonable accommodations" with which Cavaliere claims she could have performed the essential functions of her job at ASI -- but without which she was deemed to be disabled for SSDI purposes -- were traveling less and working from home.  ASI replies that "Cavaliere never asked ASI to reduce her travel, nor did ASI ever tell her that she could not reduce her travel," Def.'s Reply Mem. in Supp. of Mot. Summ. J. ("Def.'s Reply") at 2, and that "Cavaliere testified that she did in fact work from home while at ASI, and that she did so at least as of October 2009 -- after the alleged onset of her condition." Id. at 3 (emphasis in original).  We must judge

25

whether a reasonable juror could believe that Cavaliere's stated need for accommodations reconciles her application for SSDI and her claims here under the ADA.

According to ASI, Cavaliere is "ask[ing] this Court to rule that an ADA plaintiff" can evade estoppel by "claim[ing] that she could have performed her job with an accommodation that is not requested of the employer nor identified until after her termination, and one that she could have exercised of her own accord". ASI contends that "[t]he law does not permit such manipulation." Id. at 6 (emphasis omitted). We will not opine as to whether an ADA plaintiff may, as a general proposition, employ such a gambit. Our concern is rather with whether such an argument is available to a plaintiff who represents to the SSA without qualification that she left her job voluntarily due to her disability and would not have left but for her inability to work.

We conclude that such a stratagem will not work. A plaintiff cannot consistently represent on the one hand to the SSA that she voluntarily left her job and would not have left but for her inability to work, and on the other hand represent to a court that an accommodation that was known to her at the time of

her departure[12] and not requested of her employer, would have allowed her to perform the essential functions of her job.  If a plaintiff knows that a reasonable accommodation might allow her to work despite her disability and she does not request it of her employer, then she cannot claim that it was her inability to work that was the cause of her voluntary departure.

As ASI correctly notes, Cavaliere has pointed to no record evidence suggesting that she ever asked anyone at ASI to provide her with the accommodation of less travel.  Cavaliere's alleged representations to Koehler that she could not travel on specific trips because of her back problems do not constitute a request for an accommodation.  As a result, Cavaliere cannot resort to the need for accommodation of less travel to reconcile her statements to the SSA (that she voluntarily left ASI because of her inability to work) with the claims she must make before this Court (i.e., that she is capable of performing the essential

_____

[12] We assume in this discussion that we are dealing with an accommodation whose existence was known to a plaintiff at the time she ceased working.  To be sure, our reasoning would not hold if this assumption were not true since there is no contradiction between a plaintiff claiming that (1) she voluntarily left her position without requesting an accommodation because of her inability to work and (2) she only later learned of an accommodation -- perhaps a medical technology -- that might permit her to work.

functions of her position at ASI).  No reasonable juror could
believe that this travel accommodation would allow Cavaliere to
perform a job that she told the SSA she <u>left</u> because of her
(unqualified) inability to work, given that Cavaliere knew that
this accommodation might well have been afforded at the time of
her departure from ASI <u>but</u> <u>she</u> <u>did</u> <u>not</u> <u>request</u> <u>it</u>.

        In contrast, Cavaliere has pointed to record evidence
suggesting that she <u>requested</u> the accommodation of working from
home from Koehler, and that <u>this</u> accommodation was denied in
part.  Although Cavaliere was occasionally able to work from
home, she has presented evidence that she was not permitted to
work <u>solely</u> from home.  Even though Cavaliere represented to the
SSA that she voluntarily left ASI because of her (unqualified)
inability to work, she could claim -- at least theoretically --
that this latter accommodation -- allegedly requested from and
denied by ASI -- would have allowed her to perform the essential
functions of her job.

        But while there is no <u>theoretical</u> bar to this argument,
it nevertheless fails to persuade when juxtaposed against the
details of Cavaliere's application to the SSA.  As we have noted,
Cavaliere represented in her SSDI application that she (1) had
difficulty with completing tasks and concentration, (2) could not

pay attention for long, (3) was in chronic, incapacitating pain, and (4) could not work due to anxiety, depression, and OCD.  But none of these conditions has anything to do with _where_ she could work.  Cavaliere has failed to proffer _any_ explanation as to how working from home would address these limitations more successfully than working from ASI's office.  An ADA plaintiff may not simply point to any accommodation requested from, and denied by, an employer to explain away representations of disability made to the SSA.  She must provide a plausible basis for a reasonable juror to believe that the accommodation would permit her to work despite her representations of disability to the SSA.  Cavaliere has provided no such basis.  Her representations to the SSA therefore estop her from claiming that a working-from-home accommodation would have allowed her to perform the essential functions of her job at ASI.

Cavaliere has thus failed to provide an explanation "sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement [to the SSA], the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'"  Cleveland, 526 U.S. at 807. Because she is thus estopped from making out a prima facie case

29

of discrimination under the ADA, we will grant summary judgment
as to her discrimination claims under Count II of the complaint.

### B. Notice And Cavaliere's FMLA Claim

ASI argues that "[t]he Court should also dismiss the
remainder of the First Cause of Action of Cavaliere's Complaint,
alleging that ASI terminated her in retaliation for exercising
her FMLA rights, because Cavaliere cannot show that any of the
people responsible for her termination knew about her alleged
request for FMLA paperwork." Def.'s Mem. at 27. Cavaliere
responds that "[t]his argument misses the mark in terms of the
FMLA activity for which Defendants [sic] retaliated against Ms.
Cavaliere. Rather, Defendant retaliated against Ms. Cavaliere
for exercising her rights under the FMLA, namely taking time off
for a qualifying serious health condition."[13] Pl.'s Mem. at 12.
ASI replies that "Cavaliere has not proffered any evidence that
Koehler knew the extent of her alleged ailments . . . or that she

---

[13] In her complaint, Cavaliere alleges that
"Plaintiff's termination was based in substantial part due to
[sic] her FMLA-qualifying absenteeism, FMLA needs, and requests
for FMLA." Pl.'s Compl. ¶ 26. Based on her response to ASI's
motion, Cavaliere appears now to have abandoned the claim that
ASI retaliated against her based on her "requests for FMLA."

ever had to miss work because she was visiting a doctor or seeking medical treatment."  Def.'s Reply at 9.

        The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period" for certain medical conditions, including "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1).  Under the Act, it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter," § 2615(a)(2).  The Act's regulations explain that it "prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights. . . . [E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions."  29 C.F.R. § 825.220(c).

        Our Court of Appeals has explained that to succeed on an FMLA retaliation claim a plaintiff "must show that (1) he took an FMLA leave, (2) he suffered an adverse employment decision, and (3) the adverse decision was causally related to his leave." Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d

31

Cir. 2004).  In order to take FMLA leave, "[a]n employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave.  Depending on the situation, such information may include that a condition renders the employee unable to perform the functions of the job. . . " 29 C.F.R. § 825.302(c).

ASI ultimately makes two arguments with respect to Cavaliere's claim for FMLA retaliation: (1) Cavaliere "conflates two distinct concepts in FMLA jurisprudence," since her "arguments concerning whether ASI was on notice of her eligibility for FMLA leave bear more on a claim for FMLA interference than they would on her claim for FMLA retaliation," Def.'s Reply at 8 (emphasis in original); and (2) no ASI decisionmaker knew that Cavaliere was taking FMLA-protected leave since no decisionmaker knew "the extent of her alleged ailments." Id. at 9.

With respect to ASI's first argument, ASI seems to confuse the elements of a claim for retaliation under the FMLA. The question of whether an employer is on notice that an employee's leave qualifies for FMLA protection is relevant not only to claims for FMLA interference but also to claims for FMLA

32

retaliation.[14]  For a plaintiff to prove the first element of a
retaliation claim under Conoshenti -- that "he took an FMLA
leave," 364 F.3d at 146 -- he must show that he "provide[d] at
least verbal notice sufficient to make the employer aware that
the employee needs FMLA-qualifying leave." § 825.302(c).

        This brings us to ASI's second argument, that
"Cavaliere has not proffered any evidence that Koehler knew the
extent of her alleged ailments."  Def.'s Reply at 9.  Cavaliere
has pointed to evidence in the record suggesting that (1) she
told Koehler that her back problems prevented her from making

---

        [14] ASI's argument does raise an interesting question:
for an FMLA plaintiff to prove the third Conoshenti element, must
she show that the decisionmaker who took an alleged adverse
employment decision against her was aware that her leave
qualified for FMLA protection?  Our reading of Conoshenti
suggests that the answer to this question is "no".  In that
decision, our Court of Appeals stated only that a plaintiff must
show that "the adverse decision was causally related to his
leave," 364 F.3d at 146 -- not to "his taking of leave under the
FMLA."  Upon reflection, this makes sense.  If a plaintiff
informs one supervisor at her employer that she may need to take
leave under the FMLA, then takes leave and experiences an adverse
employment decision at the hands of another supervisor because of
her leave-taking, a right has been violated under the FMLA even
if the second supervisor did not know that the leave qualified
for FMLA protection.  In this case, Cavaliere has presented
evidence suggesting that she informed Koehler of her need for
FMLA-qualifying leave, and that Koehler later retaliated against
her for taking such leave -- so that the first and second
supervisors in our hypothetical are here the same individual.  We
thus need not reach this question, though we note it in the
interests of analytical precision.

specific trips; (2) she told Koehler about her medical conditions
in September of 2009; (3) she wore a brace and shoulder device,
including to work; (4) Koehler told Cavaliere that she needed to
care for her back on multiple occasions; and (5) Koehler told co-
workers at ASI that Cavaliere was absent from work because of her
back.  Drawing all reasonable inferences in Cavaliere's favor, a
factfinder could reasonably conclude from this evidence that
Cavaliere notified ASI (via Koehler) that she needed FMLA-
qualifying leave -- as the first <u>Conoshenti</u> element requires.
Furthermore, a factfinder could conclude that the decisionmaker
who ultimately took the alleged adverse employment decision
against Cavaliere -- Koehler -- was aware that Cavaliere had
taken leave, as the third <u>Conoshenti</u> element requires.

   Of course, ASI contests the evidence described above,
but Cavaliere has at the least carried her burden of showing a
genuine dispute as to whether (1) she provided sufficient notice
to ASI of her need for FMLA-qualifying leave, and (2) Koehler --
one of the decisionmakers who participated in her termination --
knew she had taken leave.  Inasmuch as these are the only two
aspects of Cavaliere's FMLA retaliation claim that ASI
challenges, we will deny its motion for summary judgment with
respect to Count I of the complaint.

C.   **Cavaliere's Claim For Damages**

Finally, ASI argues that "Cavaliere is not entitled to back pay or front pay damages in this action because the SSA determined that she was completely disabled as of her last day of work, and she continues to be disabled through the date of this motion." Def.'s Mem. at 29. Cavaliere responds that "the factual inquiry of Ms. Cavaliere's availability for work is the same with respect to both her ability to establish her prima facie case and her ability to recover front and back pay," and that since her "disability award should not preclude her from asserting claims under the ADA . . . . [t]he same rationale should apply with respect to a plaintiff's availability to recover front and back pay damages." Pl.'s Mem. at 15.

As Judge Pollak has explained, "[t]he underlying premise in computing an employment discrimination plaintiff's award . . . is that the injured worker must be restored to the economic position in which the worker would have been but for the discrimination." Mason v. Assoc. for Independent Growth, 817 F. Supp. 550, 553 (E.D. Pa. 1993). Thus, "in a variety of situations, a back pay award is reduced, or eliminated entirely, if the plaintiff has not received -- or, indeed, could not receive -- offsetting income in the post-discriminatory period,"

35

so that "as a general rule, a claimant will not be allowed back pay during any periods of disability."   Id. at 554.

Cavaliere is correct that this general rule would not apply when a claimant's disability may be reconciled with her ability to perform the essential functions of her position if given reasonable accommodations.  We have already determined, however, that Cavaliere's pursuit and receipt of SSDI cannot be reconciled with her having such an ability to work.  As Cavaliere suggests, we will apply "[t]he same rationale," Pl.'s Mem. at 15, to both her discrimination claim under the ADA and her damages claims for back pay and front pay.  In both cases, we find that Cavaliere's representation to the SSA that she was disabled beginning on March 8, 2010[15] -- the date ASI terminated her employment -- estops her from claiming that she could perform the essential functions of her position at ASI, so that she can assert neither claim successfully.  We will therefore grant ASI's motion for summary judgment with respect to Cavaliere's damages claim for back pay and front pay.

---

[15] Though Cavaliere states that she does not remember telling SSA that her disability began on this date, we have already explained that the SSA itself noted her representation to this effect.  Cavaliere's failure to recall conveying this information does not create a genuine dispute of fact on this point, given the SSA's affirmative statement to the contrary.

BY THE COURT:


__\s\Stewart Dalzell